[Civ. No. 6109. Fifth Dist. June 28, 1983.]

JACK R. WILKINSON, Plaintiff and Appellant, v.
MADERA COMMUNITY HOSPITAL et al.,
Defendants and Respondents.

COUNSEL

Paul A. Eisler for Plaintiff and Appellant.

Musick, Peeler & Garrett, James B. Bertero, Stammer, McKnight, Barnum & Bailey and Carey H. Johnson for Defendants and Respondents.

## OPINION

**BROWN (G. A.), P. J.**—The Madera Community Hospital (Hospital) refused to reappoint Jack R. Wilkinson, M.D., to the medical staff of the Hospital because he failed to maintain malpractice insurance with a "recognized insurance company" as was required by the Hospital's rules. The doctor's petition for a writ of mandate to compel the Hospital to reinstate his staff privileges was denied by the superior court. He appeals.

The board of trustees of the Hospital enacted a resolution which required all members of its medical staff to maintain malpractice insurance "with a recognized insurance company" in the minimum amount of $500,000 per occurrence. The Hospital interpreted "recognized" as meaning an insurance company admitted to transact a casualty insurance business in California by the California Department of Insurance. An admitted insurer is one that has been issued a certificate of authority by the California Insurance Commissioner.

Pursuant to its resolution, the Hospital refused to accept malpractice coverage obtained by petitioner with Commonwealth Marine and General Assurance Company, Ltd. for $1 million per occurrence. Commonwealth was domiciled in Belize, Central America, and had not been admitted in California to conduct a malpractice insurance business.

The Hospital passed its resolution pursuant to the authority contained in Health and Safety Code section 1319 (hereinafter section 1319), which states: "The rules of a health facility may include provisions that require every member of the medical staff to have professional liability insurance as a condition to being on the medical staff of the health facility."

Appellant levels a series of constitutional attacks on the statute and the action of the Hospital board. Before discussing those contentions, it is appropriate to recognize the importance to the Hospital, to potential claimants, and to the insured of requiring staff doctors to have medical malpractice insurance coverage with an insurance company that has been admitted to engage in a malpractice insurance business in California.

The authority of the Insurance Commissioner over an admitted carrier is comprehensive. (See Ins. Code, § 700 et seq.) The Insurance Commissioner continuously monitors admitted companies for compliance with the Insurance Code. Monitoring is achieved primarily by financial surveillance of the activities of a licensed insurer. Every insurance carrier must file both quarterly and annual financial statements with the Insurance Commissioner. Every carrier is subject to periodic examination by the commissioner. Every

admitted carrier must be a member of the California Insurance Guarantee Association. The association protects the interests of policyholders and claimants of an insolvent insurer. (See Ins. Code, § 1063 et seq.) Producers writing business on behalf of the licensed insurer are in turn subject to examination, licensing, regulation and discipline by the Insurance Commissioner.

By comparison, the Insurance Commissioner exercises no authority over an insurer, such as Commonwealth Marine and General Assurance Company, Ltd., not admitted to transact an insurance business in California.[1]

At the time the Hospital acted in this case, the Department of Insurance had not made any determination with respect to the quality, liquidity and availability of Commonwealth's assets. Moreover, in denying reappointment to appellant, the Hospital was aware that both the Insurance Commissioner and the Surplus Line Association had deemed Commonwealth to be an unacceptable insurance carrier in California. It follows that a policy of medical malpractice insurance with an admitted carrier, as compared to a nonadmitted carrier, would be more likely to furnish secure financial protection to the Hospital, to the Hospital's patients, and to the insured himself.

Turning to section 1319, in *Rosner* v. *Peninsula Hospital Dist.* (1964) 224 Cal.App.2d 115 [36 Cal.Rptr. 332], the court held that a district hospital could not, absent statutory authority, impose a requirement for minimum malpractice insurance as a condition of medical staff membership. *Rosner* was decided before the enactment of section 1319. The legislative history of section 1319 reveals that the purpose of its adoption in 1974 (Stats. 1974, ch. 889, § 1, p. 1889), was to overrule the holding in *Rosner* by authorizing a health facility to adopt rules requiring that members of such facility's medical staff have professional liability insurance as a condition of being on the medical staff of such facility.

Appellant's brief is not brief. It is prolix, rambling and repetitive. Appellant launches a multi-faceted constitutional attack on section 1319.[2]

Appellant urges that by enacting Health and Safety Code section 1319 the Legislature unconstitutionally delegated its authority to the hospital board

[1]There is a narrowly defined exception to this statement permitting a private citizen to enter into an insurance contract with a nonadmitted insurer (Ins. Code, § 1760) or through certain licensed surplus line brokers (Ins. Code, § 1760.5 et seq.).

[2]We note that several courts in other states have upheld such statutes in the face of various attacks: *Pollock* v. *Methodist Hospital* (E.D.La. 1975) 392 F.Supp. 393; *Renforth* v. *Fayette Memorial Hospital Association, Inc.* (1978) 178 Ind.App. 475 [383 N.E.2d 368]; *Holmes* v. *Hoemako Hospital* (1977) 117 Ariz. 403 [573 P.2d 477]; *Jones* v. *State Board of Medicine* (1976) 97 Idaho 859 [555 P.2d 399].

and to insurance companies. He asserts that under the broad language of the section, hospitals are free to arbitrarily determine who may or may not practice medicine by establishing what insurance companies are acceptable and the amount of malpractice insurance that must be carried. He argues that section 1319 does not contain any standards or safeguards which prevent hospitals from denying privileges on the basis of arbitrary insurance requirements.

■ At the outset, we observe that "[b]efore a court may declare an act of the Legislature invalid because of due process or other constitutional conflict, 'such conflict must be clear, positive, and unquestionable.'" (*Naismith Dental Corp.* v. *Board of Dental Examiners* (1977) 68 Cal.App.3d 253, 259 [137 Cal.Rptr. 133].)

■ Once it has established the law, the Legislature may delegate the authority to administer or apply the law. (*People* v. *Wright* (1982) 30 Cal.3d 705, 713 [180 Cal.Rptr. 196, 639 P.2d 267].) A proper delegation may be made to private or governmental entities. (*Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 379-380 [71 Cal.Rptr. 687, 445 P.2d 303].)

■ "An unconstitutional delegation of legislative power occurs when the Legislature confers . . . unrestricted authority to make fundamental policy decisions. [Citations.]" (*People* v. *Wright, supra,* 30 Cal.3d at p. 712.) In order to avoid an unlawful delegation of its authority, the Legislature must first resolve the "truly fundamental issues," and must then "establish an effective mechanism to assure the proper implementation of its policy decisions." (*Kugler* v. *Yocum, supra,* 69 Cal.2d at pp. 376-377.)

Thus, a delegation of authority must be accompanied by safeguards which insure that the delegatee does not act arbitrarily. (*Kugler* v. *Yocum, supra,* 69 Cal.2d at p. 376.) In a proper case, however, the requisite safeguards may be implied by the statutory purpose. (*People* v. *Wright, supra,* 30 Cal.3d 705, 713.) In fact, "it is common for the courts to imply them. [Citation.]" (*County of Kern* v. *Pacific Gas & Electric Co.* (1980) 108 Cal.App.3d 418, 422 [166 Cal.Rptr. 506].)

■ In the case at bench, it is clear that the Legislature did not delegate a policy-making function to hospitals. By determining that a hospital could deny privileges to a doctor who had not obtained insurance, the Legislature resolved a "fundamental issue." (*Kugler* v. *Yocum, supra,* 69 Cal.2d at p. 376.) Pursuant to its legislative policy-making power, the Legislature determined that the best interests of society would be served by allowing hospitals the discretion to require staff doctors to carry malpractice insur-

ance. Inherent in this legislative policy is the determination that noninsured doctors may be barred from practicing in a hospital.

■ However, the question remains as to whether section 1319 contains sufficient safeguards to prevent hospitals from devising arbitrary insurance requirements. As has been noted above, safeguards may be implied by the statutory purpose. (*People* v. *Wright, supra,* 30 Cal.3d at p. 713.) The purpose of section 1319 is to protect the financial integrity of hospitals. By permitting hospitals to require doctors to carry malpractice insurance as a condition of obtaining staff privileges, the Legislature guaranteed that hospitals would not be left holding the liability bag for torts committed by doctors.

In light of the increasing number and amount of personal injury verdicts against doctors and hospitals, it is highly germane to consider a hospital's interest in having its staff doctors insured in an adequate amount and by a reliable carrier.[3]

Such coverage protects the vital financial integrity of a hospital. It provides an assured fund to pay a judgment where the doctor is held personally liable. If by reason of the relationship between a doctor and a hospital, the hospital is held jointly liable with the primarily responsible doctor, the hospital would have the right of indemnification against the doctor and the doctor's carrier. Thus, the existence of malpractice insurance covering staff doctors would likely reduce the insurance premium on the hospital's liability coverage. Lastly, the existence of such coverage protects hospital patients.

Returning to the unconstitutional delegation argument, in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001], a city charter delegated authority to a rent control board to set rents in the city. Although setting forth certain nonexclusive factors which the board was to consider in setting rents, the charter was silent as to how the factors were to be translated into concrete monetary figures. The Supreme Court held that the charter contained sufficient safeguards, since "the charter amendment's purpose of counteracting the ill effects of 'rapidly rising and exorbitant rents exploiting [the housing] shortage' . . . implies a standard of fixing maximum rent levels at a point *that permits the landlord to charge a just and reasonable rent and no more.* [Citation.]" (*Id.,* at p. 168; italics

---

[3]We note that the law is continuing to be liberalized to permit recovery against hospitals for staff doctors' malpractice. For example, in the recent case of *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156], the court held that a hospital could be held liable for a tort committed by a doctor who was a member of its medical staff, notwithstanding the fact that the doctor was not an employee or agent of the hospital.

added.) The court went on to note that safeguards could only be as definite " '. . . as the exigencies of the particular problem permit.' [Citation.]" (*Ibid.*)

A similar situation is presented in this case. As is well known, insurance premiums are constantly subject to change. Thus, the Legislature could not have set a specific monetary figure as to how much insurance could be required. As in *Birkenfeld*, it would appear that the "exigencies" of the particular situation prohibit the Legislature from setting any particular limits on the amount of insurance which a doctor may be compelled to obtain.[4]

■ A hospital may generally refuse privileges to a doctor so long as the criteria employed are not "substantively irrational or otherwise unreasonably susceptible of arbitrary or discriminatory application." (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 627 [166 Cal.Rptr. 826, 614 P.2d 258]; fn. omitted.) Thus, any insurance requirement adopted by a hospital would pass judicial muster if it was rational and nondiscriminatory.[5] In light of the foregoing, the implication of a reasonableness safeguard into section 1319 would appear to be highly appropriate.

■ We conclude that section 1319 may be read as containing the implied safeguard that hospitals may only devise reasonable insurance requirements. These requirements would be only those which would guarantee that the hospital would be protected in the event the doctor committed malpractice. The establishment by the hospital board pursuant to section 1319 of the amount of malpractice insurance and the requirement that it be placed with a company admitted to do a malpractice business in California were reasonable and authorized requirements. Those requirements are rationally needed to protect the financial integrity of the hospital.

---

[4]*Kugler* v. *Yocum, supra,* 69 Cal.2d 371, is a somewhat similar case. There, a city ordinance provided that certain city employees would be paid no less than the average pay received by similarly situated employees of the adjoining city and county. It was held that the delegation contained sufficient safeguards, since it could be assumed that the city and county "would reasonably discharge their obligations." (*Id.,* at p. 383.)

[5]Appellant argues the hospital's requirement that the medical staff have insurance with a "recognized insurance company" is arbitrary and vague. He contends that the term is so indefinite that the hospital may arbitrarily exclude any doctor it does not want on its staff. This contention is meritless.

As has been pointed out, the requirement that insurance be obtained from a company authorized to transact an insurance business in California is entirely consistent with the purpose of section 1319, which is to protect the financial integrity of the hospital and its patients. The protection authorized by section 1319 would be entirely illusory if a doctor could obtain insurance from a carrier which was or became unable to pay off claims. Viewed in this light, the hospital's rule is neither irrational nor susceptible of arbitrary application. (*Miller* v. *Eisenhower Medical Center, supra,* 27 Cal.3d at p. 627.)

■ Relying upon *Rosner v. Peninsula Hospital Dist., supra,* 224 Cal.App.2d 115, appellant contends section 1319 constitutes an unlawful delegation of legislative authority to insurance companies. *Rosner* was decided before the passage of section 1319. In that case a hospital district had a requirement that a doctor could not be admitted to its medical staff unless he obtained malpractice insurance in the amount of $100,000 for each occurrence or made a cash deposit of at least $300,000. It was held that this requirement constituted an unlawful delegation of authority to insurance companies, since there were no safeguards preventing an insurer from arbitrarily denying coverage to a doctor. (*Id.,* at p. 122.)

In light of the subsequent Supreme Court authority, we decline to follow *Rosner.* In *Wilke & Holzheiser, Inc. v. Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349 [55 Cal.Rptr. 23, 420 P.2d 735], a liquor retailer challenged certain statutes which permitted liquor wholesalers to set the minimum price for the retail sale of their product. The retailers contended that the Legislature had unlawfully delegated authority to the wholesalers. This contention was rejected.

"Yet, if the producer's contractual designation of a resale price binding on all retailers is not the exercise of an unlawfully delegated legislative power, the statutory *requirement* that he designate that price cannot transform his act into the exercise of such a power. The statutory requirement clearly confers no *power* on the producer that he would not have possessed without it.

". . . The opinion points out that the act of designating a resale price binding on all retailers is ' "no more legislative in character than are other acts . . . of private parties undertaken as a prerequisite to the application of a statute." ' " (*Id.,* at p. 365.) Stated otherwise, there was no delegation of legislative authority since the wholesalers were already free to require a minimum retail price as a term of their contract with retailers.

The identical analysis applies in this case. Insurance companies are entitled to deny policies to doctors for arbitrary reasons (*Ascherman v. San Francisco Medical Society* (1974) 39 Cal.App.3d 623, 654 [114 Cal.Rpt. 681]), except that companies may not discriminate on the basis of race, religion, ancestry, sex or marital status (Ins. Code, § 679.71). Insurers are also prohibited from charging excessive rates. (See Ins. Code, § 1850 et seq.)[6] Thus, as in *Wilke & Holzheiser, Inc.,* the Legislature has not autho-

---

[6]Despite these statutory limitations on insurers' conduct, appellant asserts countless times that insurance companies commonly deny coverage on the basis of arbitrary or whimsical reasons. (Also see *Rosner v. Peninsula Hospital Dist., supra,* 224 Cal.App.2d at p. 120;

rized a private entity to do anything other than what it was already entitled to do. We conclude that section 1319 does not delegate legislative authority to insurance companies.

■ Appellant argues that section 1319 deprives him of due process because it authorizes a hospital to arbitrarily establish the type, amount and quality of insurance. This argument has already been essentially answered under another guise. It need not detain us long.

"In determining whether legislation is violative of due process, courts 'exercise an extraordinary power over a coordinate branch of government and perform a correspondingly narrow function: we simply determine whether the statute reasonably relates to a legitimate governmental purpose.' (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control,* 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735].) 'The doctrine . . .—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded.' (*Ferguson* v. *Skrupa,* 372 U.S. 726, 730 [10 L.Ed.2d 93, 97, 83 S.Ct. 1028, 95 A.L.R.2d 1347].)" (*Naismith Dental Corp.* v. *Board of Dental Examiners, supra,* 68 Cal.App.3d at p. 259.)

From what has been said, section 1319 is reasonably related to the legitimate governmental purpose of protecting hospitals from sole liability for torts committed by members of their medical staff and tends to assure that doctors will be more likely to obtain malpractice insurance. The means employed by section 1319 are rationally related to that purpose. We perceive nothing irrational or arbitrary about its requirements.

While the statute does not bear directly on a doctor's competence to practice medicine,[7] it is not for the courts to decide social policy. Our inquiry extends only to determining if the statute has a proper purpose and that the means adopted to carry out the purpose are rationally related to that purpose.

---

agreeing with appellant.) Although no empirical data is supplied in support of this assertion, at least one case indicates that appellant is wrong. In *Ascherman* v. *San Francisco Medical Society, supra,* 39 Cal.App.3d 623, an insurer had a contract with a medical society whereby it agreed to insure the society's members. The insurer denied coverage to only one percent of those who applied for a policy. (*Id.,* at p. 654.) It would be contrary to the self-interest of the insurance company to do otherwise.

[7]Pragmatically, if a doctor could not obtain malpractice insurance because of numerous claims and malpractice judgments made against him, the existence of such claims and judgments might have some bearing upon the doctor's competence. At least, it would not be unreasonable for a hospital or potential claimant to so view the existence of such judgments and claims.

We hasten to add that there is no suggestion or intimation in this record that Dr. Wilkinson is not a fully competent doctor or that he has claims or judgments against him.

■ Appellant argues that the statute is arbitrary because it does not permit a doctor to meet the financial responsibility requirements by demonstrating his own financial worth. On the contrary, it is entirely reasonable to forbid qualification by proof of self worth. Financial worth is ephemeral. A person's worth can and does change rapidly, many times depending upon forces and circumstances over which the individual has no control. Thus, continuing financial responsibility would require frequent review. Moreover, such a method would be more subjective and more likely to be arbitrarily administered than requiring an insurance policy in a minimum amount from an admitted carrier.

Appellant argues that section 1319 deprives him of due process since he is prohibited from exercising his property right to practice medicine. (*Edwards* v. *Fresno Community Hosp.* (1974) 38 Cal.App.3d 702, 705 [113 Cal.Rptr. 579, 3 A.L.R.4th 1209].) The existence of this property right does not avail appellant of any higher degree of judicial scrutiny of section 1319 than has already been applied. In cases concerning the licensing of doctors, the Supreme Court has applied only a rational relationship test. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 17-18 [112 Cal.Rptr. 786, 520 P.2d 10].) As has already been discussed, section 1319 survives scrutiny under this standard of review.

■ Appellant also contends that section 1319 is unconstitutionally vague. He is in error. "'. . . A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language.' [Citation.]" (*American Civil Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4].) By reading section 1319 as permitting only reasonable insurance requirements, the statute is sufficiently certain to survive constitutional scrutiny.

Without legal argument other than to state the conclusion, appellant notes that in other fields where the Legislature has enacted mandatory insurance requirements it has also provided the means whereby insurance can be obtained from a state agency. Thus, state agencies supply workers' compensation insurance, disability insurance, and unemployment insurance. As appellant notes, there is no state agency which supplies insurance to doctors who seek hospital privileges. He concludes that the Legislature "must provide commensurate statutory legislation guaranteeing that every licensed physician required to carry such insurance can obtain it, . . ." Since appellant has suggested no legal argument supporting this suggestion, we decline to address it.

■ Appellant contends that his right to equal protection of the law is violated by section 1319 in that the section discriminates on the basis of

wealth. In appellant's view, a doctor may be prevented from obtaining privileges at a hospital merely because he cannot afford to purchase insurance. We need not reach this contention.

In order to challenge the constitutionality of a statute on the ground that it is discriminatory, the complaining party must be a member of the class which is allegedly being discriminated against. (*Estate of Horman* (1971) 5 Cal.3d 62, 77-78 [95 Cal.Rptr. 433, 485 P.2d 785]; *Stocks* v. *City of Irvine* (1981) 114 Cal.App.3d 520, 531 [170 Cal.Rptr. 724].) Here, appellant has made no contention or showing that he cannot afford to obtain insurance. Accordingly, appellant is foreclosed from raising the theory that section 1319 discriminates on the basis of wealth. (*Estate of Horman, supra,* 5 Cal.3d at pp. 77-78.)

 Lastly, appellant urges that there is a fatal conflict between state and federal law. Since federal law is supreme, appellant concludes that section 1319 must be struck down. (13 Cal.Jur.3d, Constitutional Law, § 9, pp. 33-34.) This contention is meritless.

Appellant cites 42 United States Code section 1395a[8] which generally provides that patients receiving benefits under certain federal programs are entitled to the services of the doctor of their choice. Appellant urges that section 1319 conflicts with federal law since it prohibits patients from choosing uninsured doctors.

In making this contention, appellant overlooks 42 United States Code section 1395[9] which specifically provides that federal authorities may not supervise or control the administration of health care. Section 1395 indicates that a state may determine the conditions a doctor must satisfy in order to practice medicine. (See generally, *O'Bannon* v. *Town Court Nursing Center* (1980) 447 U.S. 773, 785-786 [65 L..Ed.2d 506, 518, 100 S.Ct. 2467]; holding that the related provision of 42 U.S.C. § 1396a does not supply a right to remain in a decertified nursing home.) In short, 42 United States Code section 1395a does not prohibit the states from engaging in reasonable regulation of the medical professions.

---

[8]42 United States Code section 1395a provides: "Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services."

[9]42 United States Code section 1395 provides: "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person."

The judgment is affirmed.

Franson, J., and Woolpert, J., concurred.