[No. 50634-5. En Banc. September 11, 1986.]

WILLIAM BACKLUND, *Respondent*, v. THE BOARD OF COMMISSIONERS OF KING COUNTY HOSPITAL DISTRICT NO. 2, *Appellant*.

*Philip L. Carter* and *David J. Smith* (of *Livengood, Silvernale, Carter & Tjossem*), for appellant.

*Nathan James Neiman,* for respondent.

CALLOW, J.—The Board of Commissioners of King County Hospital District 2 terminated Dr. William Backlund's hospital privileges at Evergreen Hospital because of

his refusal to purchase professional liability insurance. The Superior Court held that the Board acted unconstitutionally, infringed on Dr. Backlund's right of free exercise of religion as guaranteed by the First Amendment, and ordered the Board to reinstate his privileges at Evergreen.

The issue presented is whether the doctor's right to religious freedom is infringed unless he is granted an exemption to a hospital bylaw[1] requiring him to carry professional liability insurance. We hold that it is not. We reverse the trial court and reinstate the decision of the Board.

Dr. Backlund is an orthopedic physician practicing in Redmond. In 1974, he applied for staff privileges at Evergreen. Dr. Backlund told the then hospital administrator that because of his religious beliefs he would not acquire professional liability insurance. The administrator informed Dr. Backlund that Evergreen did not require staff physicians to carry such insurance, and subsequently Evergreen granted him staff privileges. Since 1976, Dr. Backlund has distributed a brochure to his patients informing them that because of his Christian beliefs he does not carry professional liability insurance.

In July 1982, Evergreen began studying a proposal to require all staff physicians to acquire professional liability insurance. After study, the Board amended the hospital bylaws on June 28, 1983. The bylaws are expressly subject to amendment and physicians on the staff are "subject to such limitations as are contained in these bylaws."

Dr. Backlund refused to purchase the required insurance. The Board gave notice that failure to comply with the bylaws would result in the suspension of his privileges at Evergreen. Dr. Backlund requested a hearing. In July 1983, the Joint Conference Committee of Evergreen Hospital considered Dr. Backlund's request for an exemption from the amended bylaws and referred his request to the Board.

---

[1]The medical staff at Evergreen is subject to the Bylaws of Public Hospital District 2 of King County, which are enacted by the Board.

The Board convened a hearing in October 1983, and by mutual agreement postponed the hearing until December. Dr. Backlund testified that he had decided not to carry the professional liability insurance after studying biblical principles. He also testified that he does not carry hospital or life insurance, or use a collection agency for his practice because of his beliefs.

After the December hearing the Board entered its findings of fact and conclusions. Pertinent findings of fact relating to Dr. Backlund's beliefs include:

30. That Dr. Backlund professes to have a conviction, based upon his religion, that he should not purchase professional liability insurance coverage.

. . .

32. That Dr. Backlund's conviction with respect to professional liability insurance appears to be a unique position professed to be held solely by himself. . . .

33. That notwithstanding Dr. Backlund's position regarding professional liability insurance coverage, he maintains automobile insurance because it is required by the lease company from which he leases his automobile, and he also maintains homeowner's insurance because his mortgage lender requires it.

. . .

37. That Dr. Backlund appears to be sincere in his beliefs and appears to have held them for sometime.

Pertinent findings of fact relating to Evergreen's interest in requiring physicians to carry professional liability insurance include:

22. [sic] That it is recognized that if a physician makes an error or omission which causes harm to a patient, within the Hospital, it is likely that not only the physician, but that the Hospital will be named in any subsequent claim or lawsuit, as a party defendant.

22. That the "deep pocket" theory of litigation is well and commonly known, and it is likely that if a suit or claim were commenced against a physician and the Hospital due to an alleged error or omission that took place at the Hospital, and if through discovery in such a proceeding, it were determined that the physician were uninsured, it is likely that the claimant would attempt to

pursue the Hospital for full financial responsibility.

23. That the Hospital, named as a party defendant in a suit with an uninsured physician, may be compelled to exert greater administrative and staff effort in the preparation for defense of a malpractice claim if the physician involved is uninsured, inasmuch as said physician will not have the assistance of an insurance carrier in the preparation of the defense of his claim.

24. That RCW 4.22.030 relating to contribution amongst joint tortfeasors where the claims are indivisible, may very well place at risk the Hospital for the full amount of any claims by an injured patient even if the majority of the negligence, as would be determined by a trier of facts, were determined to be the negligence of an uninsured physician. . . .

25. That testimony indicates that settlement negotiations with a plaintiff/claimant where the physician is uninsured, are more difficult and potentially more costly to the Hospital than where the physician carries professional liability insurance coverage.

26. That Evergreen Hospital is a participant in the Washington Hospital Liability Insurance Fund . . .

27. That where claims are made against hospitals, the costs of defense and the cost of settlement or payment of said claims is borne by the fund and the participants in the fund, including Evergreen Hospital. While it may be difficult to quantify, there is no question that the more that the fund has to pay in defense of or payment or settlement of claims, the more costly the coverage is to the participants in the fund, including Evergreen Hospital. There is adequate evidence to show that where a physician is uninsured, and the Hospital is named as a party defendant in a claim which arises out of the negligence of a physician in a hospital setting, where the physician fails to maintain professional liability insurance, additional costs and expenses are incurred or may be incurred by the fund, which costs and expenses are then borne by the participants in the fund, including Evergreen Hospital.

28. That it is prudent that the Board of Commissioners exercise reasonable efforts to protect the assets of the Hospital District . . . and that requiring [professional liability insurance] coverage of physicians practicing at the Hospital is a reasonable and logical extension of the fiduciary duty of the Hospital District.

29. That where a physician is not covered by professional liability insurance, it may cause that physician, as well as the Hospital to practice defensive medicine, in order to protect the assets of the physician and the Hospital. . . . This practice should be avoided because of the extra costs to the patient and the community.

. . .

40. That while it might be difficult to quantify the detriment to the Hospital by a physician not maintaining professional liability insurance coverage, as required by the Bylaws, such detriment or potential thereof clearly exists although shared by all of the hospitals within the Washington Hospital Liability Insurance Fund. That just because it is difficult to quantify the detriment does not mean that the detriment does not exist.

. . .

42. That the Hospital District possesses the authority to require mandatory professional liability insurance coverage of physicians practicing within the Hospital.

43. That if a physician were allowed to practice in contravention of the Hospital District Bylaws requiring the maintenance of professional liability insurance, the patients and/or taxpayers of the District may have to bear additional costs and expenses which would otherwise be borne by the physician's professional liability insurance carrier.

After the Board's decision, Dr. Backlund applied for a writ of certiorari asking the Superior Court to review the Board's decision. In its oral decision, the Superior Court held that Dr. Backlund refused to comply with the insurance requirement because of "sincerely held religious beliefs", and that his conduct was constitutionally protected. Further, the court held the Board failed to meet its burden of proving compelling state interests with sufficient evidence. The court also held that the evidence before the Board failed to prove that less restrictive alternatives had been explored. The trial court concluded that the Board's decision was clearly erroneous and Dr. Backlund's privileges at Evergreen should be reinstated.

The Board requested direct review by this court. Later the Board filed with the trial court a motion for clarifica-

tion of its order. On March 1, 1985, the trial court ruled that the order required Evergreen to reinstate Dr. Backlund's privileges to admit and treat his own patients but that Evergreen was not required to place Dr. Backlund on its emergency room call list.[2] Dr. Backlund has not appealed this order.

▇ It is the province and duty of the judiciary to interpret the law. *Overton v. Economic Assistance Auth.,* 96 Wn.2d 552, 555, 637 P.2d 652 (1981); *Hearst Corp. v. Hoppe,* 90 Wn.2d 123, 130, 580 P.2d 246 (1978). *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983) stated at page 325:

> Since issues of law are the responsibility of the judicial branch to resolve, the error of law standard allows the reviewing court to essentially substitute its judgment for that of the administrative body, though substantial weight is accorded the agency's view of the law.

This standard of review applies to our review of the Board and the trial court's application of the constitutional provision involved.

▇ Factual determinations are reviewed under a different standard. Generally, courts are not to retry questions of fact already determined by an administrative body. *Franklin Cy.,* 97 Wn.2d at 324–25; *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959); *cf. Smith v. Skagit Cy.,* 75 Wn.2d 715, 453 P.2d 832 (1969). Appellate review of administrative decisions is on the record of the administrative tribunal. Although there is evidence to support a finding, the reviewing court can declare a finding to be clearly erroneous when based on the entire evidence in the record if it is left with a definite and firm conviction that a mistake has been committed. *Franklin Cy.,* 97 Wn.2d at 324; *see also Ancheta v. Daly,* 77

---

[2]Dr. Backlund asserts that his patients consent to his failure to carry malpractice insurance. However, with some exceptions, one may not contract against one's own negligence and it is against public policy to procure a release of liability for malpractice.

Wn.2d 255, 259–60, 461 P.2d 531 (1969); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 95 L. Ed. 456, 71 S. Ct. 456 (1951). A review of the record does not leave a definite and firm conviction that any mistake has been committed. The Board's findings are not "clearly erroneous". We accept the findings as found by the administrative body. The Board had ample opportunity to assess the credibility of the witnesses and to weigh the evidence.

We turn to the extent to which Dr. Backlund's beliefs and conduct are protected by the free exercise of religion clause of the first amendment to the United States Constitution.[3]

█ To qualify for First Amendment protection individuals must prove only that their religious convictions are sincere and central to their beliefs. The court will not inquire further into the truth or reasonableness of the individual's convictions. As stated by Justice Douglas in *United States v. Ballard,* 322 U.S. 78, 86–87, 88 L. Ed. 1148, 64 S. Ct. 882 (1944):

> [The First Amendment] not only "forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship" but also "safeguards the free exercise of the chosen form of religion." *Cantwell* v. *Connecticut,* 310 U. S. 296, 303. "Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Id.,* pp. 303–304. Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. *Board of Education* v. *Barnette,* 319 U. S. 624. It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the

---

[3]The parties have not argued persuasively for a different application of the provisions of the First Amendment and Const. art. 1, § 11 (amend. 34) of the state constitution as they pertain to the exercise of religion.

ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.

*See also State v. Meacham,* 93 Wn.2d 735, 740, 612 P.2d 795 (1980); L. Tribe, *American Constitutional Law* § 14–11 (1977). Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. *Thomas v. Review Bd.,* 450 U.S. 707, 714, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981). Courts "have nothing to do with determining the reasonableness of the belief." *State ex rel. Bolling v. Superior Court,* 16 Wn.2d 373, 384, 133 P.2d 803 (1943) (quoting *Barnette v. West Va. Bd. of Educ.,* 47 F. Supp. 251, 253 (S.D. W. Va. 1942), *aff'd,* 319 U.S. 624, 147 A.L.R. 674 (1943)).

The trial court held that Dr. Backlund's beliefs are sincere. Dr. Backlund's beliefs, being sincere, warrant First Amendment protection. However, not all burdens on reli-

gion are unconstitutional. *See, e.g., United States v. Lee,* 455 U.S. 252, 71 L. Ed. 2d 127, 102 S. Ct. 1051 (1982); *Prince v. Massachusetts,* 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (1944); *Reynolds v. United States,* 98 U.S. 145, 25 L. Ed. 244 (1879). Since Dr. Backlund's beliefs are protected by the free exercise clause of the First Amendment, the burden of proof shifts to the Board to prove that (1) a compelling governmental interest justifies the regulation in question and (2) the regulation is the least restrictive imposition on the *practice* of his belief to satisfy that interest. *United States v. Lee,* 455 U.S. at 257; *State v. Meacham,* 93 Wn.2d at 740.

To justify a substantial infringement of a First Amendment right there must be a compelling governmental interest.

> It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation," . . .

*Sherbert v. Verner,* 374 U.S. 398, 406, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963) (quoting *Thomas v. Collins,* 323 U.S. 516, 530, 89 L. Ed. 430, 65 S. Ct. 315 (1945)). This court has stated the test as follows:

> [Religious] freedom can be restricted "only to prevent grave and immediate danger to interests which the State may lawfully protect." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 639, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A. L. R. 674 (1943). . . . The test must be applied to the facts of each case because, as its author said, "It is a question of proximity and degree."

*State ex rel. Holcomb v. Armstrong,* 39 Wn.2d 860, 864, 239 P.2d 545 (1952).

■ However, conduct motivated by religious beliefs may be subject to regulation if that conduct conflicts with the exercise of the interests of third parties. This concern was articulated by Thomas Jefferson:

> "Believing with you that religion is a matter which lies solely between man and his God, that he owes

account to none other for his faith or his worship, that *the legislative powers of government reach actions only, and not opinions,* I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced *he has no natural right in opposition to his social duties.*" (Emphasis added.) 8 Works of Thomas Jefferson, 113.

*Braunfeld v. Brown,* 366 U.S. 599, 604, 6 L. Ed. 2d 563, 81 S. Ct. 1144 (1961). In *United States v. Lee,* 455 U.S. at 261, we find:

Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect *enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.*

(Italics ours.)

In the area of health and safety, governmental interests often override individual objections to regulations relating thereto. *See Jacobson v. Massachusetts,* 197 U.S. 11, 49 L. Ed. 643, 25 S. Ct. 358 (1905) (the State can require vaccination though contrary to an individual's religious beliefs); *Jehovah's Witnesses v. King Cy. Hosp.,* 278 F. Supp. 488 (W.D. Wash. 1967) (the State may require blood transfusions for children over objections of parents), *aff'd,* 390 U.S. 598, 20 L. Ed. 2d 158, 88 S. Ct. 1260 (1968); *State ex rel. Holcomb v. Armstrong, supra* (University of Washington requirement that students have an X-ray examination before registration to discover possible tuberculosis infec-

tions overrode religious objections thereto); *In re Hamilton,* 657 S.W.2d 425 (Tenn. Ct. App. 1983) (the State may require a 12–year–old girl to submit to cancer treatment over the religious objections of parents).

In many jurisdictions mandatory professional liability insurance requirements are seen as bearing a rational relationship to the health and welfare of the public. The courts have uniformly upheld such requirements, whether in the form of a legislative enactment[4] or hospital rule, because hospitals have the right to take reasonable measures to protect their assets and the patients they serve. *See, e.g., Renforth v. Fayette Mem. Hosp. Ass'n,* 178 Ind. App. 475, 383 N.E.2d 368, 375 (1978), *cert. denied,* 444 U.S. 930 (1979); *Holmes v. Hoemako Hosp.,* 117 Ariz. 403, 573 P.2d 477, 7 A.L.R.4th 1231 (1977); *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 576 P.2d 221, *appeal dismissed,* 439 U.S. 808 (1978); *Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied,* 431 U.S. 914 (1977); *Pollock v. Methodist Hosp.,* 392 F. Supp. 393 (E.D. La. 1975). The interests that a hospital has in enacting a mandatory professional liability insurance requirement have been expressed as follows:

> *In light of the increasing number and amount of personal injury verdicts against doctors and hospitals, it is highly germane to consider a hospital's interest in having its staff doctors insured in an adequate amount and by a reliable carrier.*
>
> *Such coverage protects the vital financial integrity of a hospital. It provides an assured fund to pay a judgment where the doctor is held personally liable.* If by reason of the relationship between a doctor and a hospital, the hospital is held jointly liable with the primarily responsible doctor, the hospital would have the right of indemnification against the doctor and the doctor's car-

---

[4]At least two states have enacted legislation requiring health care providers, generally physicians and hospitals, to carry professional liability insurance as a condition of obtaining a license to conduct medical related activities in their states. Kan. Stat. § 40–3402 (1981 & Supp. 1985); 40 Pa. Cons. Stat. Ann. § 1301-.701 (Purdon Supp. 1985).

rier. Thus, the existence of malpractice insurance covering staff doctors would likely reduce the insurance premium on the hospital's liability coverage. *Lastly, the existence of such coverage protects hospital patients.* (Footnote omitted. Italics ours.) *Wilkinson v. Madera Comm'ty Hosp.,* 144 Cal. App. 3d 436, 443, 192 Cal. Rptr. 593 (1983).

However, *Rosner v. Peninsula Hosp. Dist.,* 224 Cal. App. 2d 115, 36 Cal. Rptr. 332 (1964) held that a hospital district could not, absent statutory authority, impose a requirement of minimum malpractice insurance as a condition of medical staff membership. In 1974, the California Legislature adopted statutory authority overruling *Rosner.*[5] *See Wilkinson,* 144 Cal. App. 3d at 441.

Thus health and welfare regulations curtailing the free exercise of religion are justified in order to protect the interests of third parties. With this in mind, we consider whether the Board's findings substantiate the conclusion that a compelling governmental interest is involved in the instant case. We find that the findings do.

At the Board hearings to consider Dr. Backlund's request of an exemption to the bylaw requiring him to carry professional liability insurance or face termination of his privileges, the hospital introduced expert testimony to demonstrate the necessity of the bylaw and to show the substantial interests involved. This testimony included: (1) that the bylaw assured, for the benefit of the hospital's patients and the community, compensation for patients injured at Evergreen aside from any liability the hospital might have; (2) that enforcement of the bylaw would have a positive impact on the amount of liability expenses that Evergreen would have in malpractice claims; (3) that if the bylaw was not enforced Evergreen would have potentially greater liability exposure because it is more difficult to settle claims prior to trial when an uninsured physician is

---

[5]Cal. Health & Safety Code § 1319 (Deering 1982) allows hospitals to require physicians to carry professional liability insurance as a prerequisite to hospital staff membership.

involved; (4) that when an uninsured physician is involved other defendants having liability insurance become the targets of a medical malpractice suit because they have insurance coverage; and (5) that the insured defendants may pay amounts disproportionately greater than their degree of fault.[6] Other testimony indicated that not requiring professional liability insurance promoted defensive medicine, that is, the ordering of unnecessary treatment for the patient in order to establish documentation in the event of a lawsuit. The practical effect of a physician's decision not to purchase professional liability insurance is that the physician's hospital and others more or less subsidize the uninsured's practice.

Dr. Backlund contracted with Evergreen for hospital privileges. It is the Board's duty to protect the financial well–being of the hospital. The Board also owes a duty to the hospital's patients, as "hospital[s have] a nondelegable duty owed directly to the patient, regardless of the details of the doctor–hospital relationship." *Pedroza v. Bryant,* 101 Wn.2d 226, 229, 677 P.2d 166 (1984). This duty includes being able to adequately provide compensation to patients injured through the negligence of the hospital and the hospital staff, including those physicians to whom Evergreen has extended privileges.

A significant number of findings of fact are devoted to the need of the hospital to require its physicians to carry professional liability insurance and these findings amply support the conclusion that there is a compelling governmental interest involved. The Board must also show that

[6]This concern was very real given then RCW 4.22.030, which read:

If more than one person is liable to a claimant on an indivisible claim for the same injury, death or harm, the liability of such person shall be joint and several.

*See also Paradise Vly. Hosp. v. Schlossman,* 143 Cal. App. 3d 87, 191 Cal. Rptr. 531 (1983) (where one of several joint tortfeasors was insolvent, the solvent tortfeasors shared liability for the shortfall).

The tort reform act (Laws of 1986, ch. 305, § 402) changes the law on joint and several liability. In any event, our consideration is of the risks as *then* contemplated by the Board.

the regulation involved is the least restrictive means necessary to satisfy the compelling governmental interest. *Thomas v. Review Bd.,* 450 U.S. at 718. *State v. Meacham, supra,* stated that to restrict an individual's exercise of conduct

> the State must have a compelling interest and the restrictive statute must have a "nexus of necessity" with the asserted State interest. If the statute's purpose may be achieved by measures less drastic than restriction of First Amendment rights, the State must utilize such other measures.

(Citations omitted.) *State v. Meacham,* 93 Wn.2d 735, 740, 612 P.2d 795 (1980).

The purpose of the bylaw is to assure that sufficient funds are available to provide for patients who successfully bring malpractice claims against Evergreen and/or the physicians involved. After study, the Board decided that an insurance requirement best met this concern. Alternatives, such as bonding, also burden the physician. The Board could find no less restrictive alternative that was practical.

Dr. Backlund asserts that the March 1, 1985 court order, which required Evergreen to reinstate his privileges solely to admit and treat his own patients, will serve the purpose of the bylaw by means less drastic than a restriction on his First Amendment rights. We disagree. The trial court order defeats the purposes of the bylaw. Dr. Backlund's practice at Evergreen, even if limited to his own patients, necessarily involves hospital personnel and the use of hospital facilities and services. Thus, compelling government interests, protection of hospital assets, patients and staff are not met by the March 1, 1985 order.

After the Board passed the bylaw, it attempted to negotiate a solution with Dr. Backlund. Dr. Backlund made it clear that he would only be satisfied with an exemption from the bylaw. Dr. Backlund also indicates that he will do whatever he can should a successful malpractice claim be brought against him. This is not sufficient since good intentions do not satisfy judgments. We find that there

exists a nexus of necessity between the bylaw and the compelling governmental interest. Further, the facts demonstrate that the bylaw's purpose could not be achieved by any less drastic restriction of Dr. Backlund's First Amendment rights.

 *Ritter v. Board of Comm'rs,* 96 Wn.2d 503, 515, 637 P.2d 940 (1981) held that a public hospital's decision withdrawing a doctor's privileges will be overturned "only if the hospital's action is arbitrary, capricious or discriminatory." *See also Rao v. Board of Cy. Comm'rs,* 80 Wn.2d 695, 698, 497 P.2d 591 ("arbitrary, tyrannical or predicated upon a fundamentally wrong basis"), *cert. denied,* 409 U.S. 1017 (1972); *Group Health Coop. v. King Cy. Med. Soc'y,* 39 Wn.2d 586, 669, 237 P.2d 737 (1951). No claim is made that the Board acted in a discriminatory manner. We need only consider whether the Board acted arbitrarily or capriciously.

Administrative action is not arbitrary or capricious if there are grounds for two or more reasonable opinions and the agency reached its decision honestly and with due consideration of the relevant circumstances. Such action is not arbitrary or capricious merely because an appellate court believes it would have reached a different decision on the same facts. *See, e.g., Barrie v. Kitsap County,* 93 Wn.2d 843, 850, 613 P.2d 1148 (1980). Our scope of review should be especially unobtrusive in this context given the gravity of interests at stake, the inherent difficulty of precisely defining fitness to be a member of a hospital staff, and the judiciary's limited capacity to question competently a hospital administration's discretion in such matters. *See Sosa v. Board of Managers,* 437 F.2d 173, 176–77 (5th Cir. 1971); *Shulman v. Washington Hosp. Center,* 222 F. Supp. 59, 64 (D.D.C. 1963); *Khan v. Suburban Community Hosp.,* 45 Ohio St. 2d 39, 44, 340 N.E.2d 398 (1976). "[S]o long as [initial] staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere." *Sosa,* at 177. There is no reason why judicial review should not be similarly limited when staff privileges are withdrawn.

*Ritter,* 96 Wn.2d at 515–16. The Board reached the decision to withdraw Dr. Backlund's privileges at Evergreen with due consideration of the relevant circumstances and, in particular, the constitutional issue at stake. The Board did not act in an arbitrary or capricious manner.

Dr. Backlund freely chose to enter into the profession of medicine. Those who enter into a profession as a matter of choice, necessarily face regulation as to their own conduct and their voluntarily imposed personal limitations cannot override the regulatory schemes which bind others in that activity. Dr. Backlund's practice is open to the public. He enjoys the economic benefits of his practice. However, the practice of orthopedic surgery is a specialty which exposes the practitioner to the risk of large liability claims. Therefore, with these benefits come corresponding burdens, and in this case the need to show financial responsibility in order to meet the liabilities which might result from his practice. Financial irresponsibility presents a substantial risk to his patients. The Board must protect those to whom it is responsible. The Board did so in mandating professional liability insurance. The Board's decision not to grant an exemption is supported by the findings and does not impinge upon Dr. Backlund's right to believe as he chooses, only upon his practice of those beliefs when such practice can be to the detriment of others.

The trial court's judgment is reversed and the decision of the Board reinstated.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.