[No. C045405. Third Dist. July 5, 2006.]

THE HESS COLLECTION WINERY, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FOOD AND COMMERCIAL WORKERS UNION AND FRESH
FRUIT AND VEGETABLES WORKERS LOCAL 1096, Real Party in
Interest.

1590

---

COUNSEL

Littler Mendelson, Randolph C. Roeder and Michael Hoffman for Petitioner.

Pacific Legal Foundation, M. David Stirling, John H. Findley and Arthur B. Mark III for Western Growers Association, California Farm Bureau Federation, Ventura County Agricultural Association, Grower-Shipper Vegetable Association of Santa Barbara & San Luis Obispo Counties, Imperial Valley Vegetable Growers Association and Howard Sagaser as Amici Curiae on behalf of Petitioner.

Bill Lockyer, Attorney General, Manuel M. Medeiros, Solicitor General, Louis R. Mauro, Assistant Attorney General, Kenneth R. Williams, Meg Halloran and Douglas J. Woods, Deputy Attorneys General, for Respondent.

Altshuler, Berzon, Nussbaum, Rubin & Demain, Scott A. Kronland, Jonathan Weissglass, Danielle E. Leonard; Weinberg, Roger & Rosenfeld and David Rosenfeld for Real Party in Interest.

Law Offices of Marcos Camacho, Marcos Camacho and Thomas Patrick Lynch for United Farm Workers of America, AFL-CIO, as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**SIMS, J.**—This case involves a challenge to the constitutionality of mandatory interest arbitration statutes applicable to agricultural employers. (Lab. Code, § 1164 et seq.; undesignated section references are to the Labor Code.)

After agricultural employer The Hess Collection Winery (Hess) and United Food and Commercial Workers Union (Union) failed to agree on the terms of an initial collective bargaining agreement, a private mediator determined the terms of a contract by which the parties would be bound, pursuant to section 1164 et seq. The Agricultural Labor Relations Board (the Board) denied Hess's petition for review of the mediator's decision.

Hess seeks an order setting aside the Board's decision. Hess contends the statutory scheme (§ 1164 et seq.) violates principles of due process in that it unreasonably interferes with the right of contract, denies the right of judicial review, and is aimed at protectionism. Hess also contends that the scheme violates equal protection, invalidly delegates legislative authority, and is vague and overbroad.

We shall conclude Hess's contentions are without merit.

### THE STATUTORY FRAMEWORK

In 2002 the Legislature declared, "a need exists for a mediation procedure in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the Agricultural Labor Relations Act [ALRA, § 1140 et seq.], ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural labor force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1.)

To that end, the Legislature enacted section 1164 in 2002. At the time of the dispute in this case, section 1164 provided:

"(a) An agricultural employer or a labor organization certified as the exclusive bargaining agent of a bargaining unit of agricultural employees may file with the board, at any time following (1) 90 days after a renewed demand to bargain by an agricultural employer or a labor organization certified prior to January 1, 2003, which meets the conditions specified in Section 1164.11 or (2) 180 days after an initial request to bargain by an agricultural employer or a labor organization certified after January 1, 2003, a declaration that the parties have failed to reach a collective bargaining agreement and a request that the board issue an order directing the parties to mandatory mediation and conciliation of their issues. 'Agricultural employer,' for purposes of this chapter, means an agricultural employer, as defined in subdivision (c) of Section 1140.4, who has employed or engaged 25 or more agricultural employees during any calendar week in the year preceding the filing of a declaration pursuant to this subdivision.

"(b) Upon receipt of a declaration pursuant to subdivision (a), the board shall immediately issue an order directing the parties to mandatory mediation and conciliation of their issues. The board shall request from the California State Mediation and Conciliation Service a list of nine mediators who have experience in labor mediation. The California State Mediation and Conciliation Service may include names chosen from its own mediators, or from a list of names supplied by the American Arbitration Association or the Federal Mediation Service. The parties shall select a mediator from the list within seven days of receipt of the list. If the parties cannot agree on a mediator, they shall strike names from the list until a mediator is chosen by process of elimination. If a party refuses to participate in selecting a mediator, the other party may choose a mediator from the list. The costs of mediation and conciliation shall be borne equally by the parties.

"(c) Upon appointment, the mediator shall immediately schedule meetings at a time and location reasonably accessible to the parties. Mediation shall proceed for a period of 30 days. Upon expiration of the 30-day period, if the parties do not resolve the issues to their mutual satisfaction, the mediator shall certify that the mediation process has been exhausted. Upon mutual agreement of the parties, the mediator may extend the mediation period for an additional 30 days.

"(d) Within 21 days, the mediator shall file a report with the board that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation

and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process. With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination. The mediator's determination shall be supported by the record." (Stats. 2002, ch. 1145, § 2, as amended by Stats. 2002, ch. 1146, § 1.)

Proponents of the legislation asserted it was necessary because, after unions were certified to represent agricultural workers, the employers refused to agree to the terms of collective bargaining agreements. (Off. of Assem. Floor Analyses, 3d reading analysis of Sen. Bill No. 1156 (2001–2002 Reg. Sess.) Aug. 30, 2002, p. 7; Off. of Assem. Floor Analyses, conc. in Sen. amendments of Assem. Bill No. 2596 (2001–2002 Reg. Sess.) Aug. 31, 2002, p. 7.)

■ A regulation adopted by the Board to implement section 1164 sets forth factors the mediator may consider, including comparison with collective bargaining agreements of similar agricultural operations. (Cal. Code Regs., tit. 8, § 20407 (regulation 20407).)[1] This regulation (operative May 7, 2003) was in effect at the time the mediator and the Board acted in this case. The list of factors was also added in a statutory amendment that added subdivision (e) to section 1164 but that did not become effective until after the mediator and the Board acted in this case. (Stats. 2003, ch. 870, § 1; see Cal. Const., art. IV, § 8 [effective date of new statutes as January 1 following 90 days after enactment].)[2]

---

[1] Regulation 20407 provides in pertinent part: "In determining the issues in dispute, the mediator may consider those factors commonly applied in similar proceedings, such as, but not limited to: [¶] (1) The stipulations of the parties. [¶] (2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer makes a plea of inability to meet the union's wages and benefit demands. [¶] (3) Comparison of corresponding wages, benefits, and terms and conditions of employment in collective bargaining agreements covering similar agricultural operations with similar labor requirements. [¶] (4) Comparison of corresponding wages, benefits, and terms and conditions of employment in comparable firms or industries in geographical areas with similar economic conditions, considering the size of the employer, the skills, experience, and training required of the employees, as well as the difficulty and nature of the work. [¶] (5) The average consumer prices for goods and services, commonly known as the Consumer Price Index, and the overall cost of living in the area where the work is performed." (Cal. Code Regs., tit. 8, § 20407, subd. (b).)

[2] The 2003 legislation added subdivision (e) to section 1164, providing in pertinent part as follows: "In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings, including: [¶] (1) The stipulations of the parties. [¶] (2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands. [¶] (3) The corresponding wages, benefits, and terms and conditions of employment in other collective bargaining agreements covering similar agricultural operations with similar labor requirements. [¶] (4) The corresponding wages, benefits, and terms and conditions of

Within seven days of the mediator's report, either party can petition the Board for review. (§ 1164.3, subd. (a).) The grounds for review are (1) a provision of the agreement is unrelated to wages, hours, or other conditions of employment, (2) a provision of the agreement is based upon clearly erroneous findings of material fact, or (3) a provision of the agreement is arbitrary or capricious in light of the mediator's findings of fact. (*Ibid.*) If the Board determines that a prima facie ground for review is shown it may grant review. (*Ibid.*)

If, upon review, the Board finds one of the grounds for review has been established, then it orders the mediator to modify the terms of the agreement. (§ 1164.3, subd. (c).) The mediator meets with the parties for 30 more days and then files another report. (*Ibid.*) The parties have the right to seek review of the second report. (§ 1164.3, subd. (d).) If, upon review of the second report, the Board again finds the report defective, then it determines the issues and issues a final order. (*Ibid.*)

The parties also have the right to seek Board review of the mediator's report on the grounds that (1) the report was procured by corruption, fraud, or other undue means, (2) there was corruption in the mediator, or (3) the rights of the petitioning party were substantially prejudiced by misconduct of the mediator. (§ 1164.3, subd. (e).) Upon such a showing the Board vacates the report, orders the appointment of a new mediator, and the mediation begins anew. (*Ibid.*)

 After Board review, either party may petition the Court of Appeal or the Supreme Court for a writ of review. (§ 1164.5, subd. (a).) Judicial review extends no further than to determine whether (1) the Board acted without, or in excess of, its powers or jurisdiction, (2) the Board did not proceed in the manner required by law, (3) the order or decision of the Board was procured by fraud or was an abuse of discretion, (4) the order or decision violates a constitutional right of the petitioner. (§ 1164.5, subd. (b).)

## THE HISTORY OF THIS DISPUTE

Hess grows grapes and produces wine in the Napa area. After the Union was certified as the exclusive bargaining representative of Hess's agricultural employees, Hess and the Union began negotiations for a collective bargaining

---

employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed. [¶] (5) The average consumer prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed." (Stats. 2003, ch. 870, § 1.)

agreement. Between 1999 and 2003, Hess and the Union engaged in approximately 23 bargaining sessions, which ended in impasse concerning 14 unresolved issues. Hess therefore implemented its best and final proposal.

In April 2003, the Union filed a declaration with the Board indicating it had failed to reach a collective bargaining agreement with Hess. The Board ordered the parties to mediation pursuant to section 1164. The parties chose Gerald McKay as the mediator and engaged in the mediation process. By August 2003, there were still unresolved disagreements concerning the collective bargaining agreement, so McKay certified the exhaustion of the voluntary mediation process and held a mandatory mediation session on the record. The Union attended and presented evidence, but Hess did not attend, contending the mandatory mediation was invalid. McKay assumed the accuracy and completeness of the Union's evidence and wrote a collective bargaining agreement for the parties. The collective bargaining agreement adopted all of the positions of the Union on the unresolved issues except with respect to the length of the agreement. Instead of the three years requested by the Union, McKay set the contract to begin on October 1, 2003, and to terminate on July 1, 2005 (which the mediator described as "amount[ing] to a one-year agreement," because the season ran from February through October).

McKay filed his report, including the collective bargaining agreement, with the Board on September 24, 2003. Hess filed a petition for Board review. The Board denied the petition for review, with the effect of making final the mediator's report and collective bargaining agreement. (§ 1164.3, subd. (b).) In denying review, the Board determined it was powerless to determine the constitutionality of section 1164 and related provisions. (Cal. Const., art. III, § 3.5.)

Hess petitioned this court for review of the Board's order. Acting on the stipulation of the parties, we stayed the Board's order pending further order of this court and issued a writ of review.[3]

## DISCUSSION

### I. *Standard of Review*

■ "In considering a facial constitutional challenge to a statute, we uphold the statute unless its unconstitutionality plainly and unmistakably

---

[3] In a footnote in its brief, amicus curiae Western Growers Association asks this court to take judicial notice of a letter prepared by the chairperson of the Board. We deny the request, which was not made in a separate motion as required by California Rules of Court, rule 22(a).

appears; all presumptions favor its validity. (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 10–11 [124 Cal.Rptr.2d 202, 52 P.3d 129]; *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 253–255 [158 Cal.Rptr. 330, 599 P.2d 636].)

"It has been said that a facial challenge can succeed only if the statute inevitably poses a present total and fatal conflict with applicable constitutional prohibitions. (*People v. Gallegos* (1997) 54 Cal.App.4th 252, 262 [62 Cal.Rptr.2d 666].) However, in *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307 [66 Cal.Rptr.2d 210, 940 P.2d 797], which held invalid a statute requiring a pregnant minor to secure parental consent or judicial authorization for an abortion, the California Supreme Court said: 'A statute that imposes substantial burdens on fundamental privacy rights with regard to a large class of persons may not be sustained against a facial constitutional attack simply because there may be a small subclass of persons covered by the statute as to whom a similar but much more narrowly drawn statute constitutionally could be applied. Thus . . . a facial challenge to a statutory provision that broadly impinges upon fundamental constitutional rights may not be defeated simply by showing that there may be some circumstances in which the statute constitutionally could be applied, when . . . there is nothing in the language or legislative history of the provision that would afford a reasonable basis for severing the asserted constitutionally permissible applications of the statute from the provision's unconstitutional applications.' [Citation.]" (*Banning v. Newdow* (2004) 119 Cal.App.4th 438, 446–447 [14 Cal.Rptr.3d 447].)

" 'It is established that in reviewing quasi-legislative actions of administrative agencies the scope of judicial review is limited to an examination of the proceeding before the agency to determine whether its actions have been arbitrary, capricious or entirely lacking evidentiary support, or whether it has failed to follow the procedure or give the notices required by law.' " (*McKinny v. Board of Trustees* (1982) 31 Cal.3d 79, 88 [181 Cal.Rptr. 549, 642 P.2d 460], quoting *County of Orange v. Heim* (1973) 30 Cal.App.3d 694, 719 [106 Cal.Rptr. 825].)

II. *Interest Arbitration*

■ Resolution of disputed contract issues through a binding process is commonly referred to as "interest arbitration" in labor law. (*Inlandboatmens Union of the Pac. v. Dutra Group* (9th Cir. 2002) 279 F.3d 1075, 1080, fn. 5.) "Interest arbitration, unlike grievance arbitration, focuses on what the terms

of a new agreement should be, rather than the meaning of the terms of the old agreement. Thus, the arbitrator is not acting as a judicial officer, construing the terms of an existing agreement and applying them to a particular set of facts. Rather, he is acting as a legislator, fashioning new contractual obligations." (*Intern. Broth. Elec. Workers v. Elec. Contractors* (6th Cir. 1995) 43 F.3d 1026, 1030.)

There can be no doubt that the Legislature has the authority to regulate employment. Indeed, our Supreme Court long ago said: "The limit to which the state may go in this direction is not well defined, but the argument that any such legislation is an interference with the right of property—the free right of contract between employer and employee—has been disposed of and settled by the courts in numerous decisions." (*Schaezlein v. Cabaniss* (1902) 135 Cal. 466, 467–468 [67 P. 755]; see also *Miller v. Wilson* (1915) 236 U.S. 373, 380–382 [59 L.Ed. 628, 630–631, 35 S.Ct. 342].)

The Legislature's authority with respect to wages and the welfare of employees is expressly recognized in our Constitution: "The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive, and judicial powers." (Cal. Const., art. XIV, § 1; see *Perry Farms, Inc. v. Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 460–462 [150 Cal.Rptr. 495].)

In view of the Legislature's clear authority to regulate the employment relationship, the question is whether the challenged legislation does so in a constitutional manner. What this legislation does is to compel the parties to submit to interest arbitration, in which the arbitrator is not interpreting an existing agreement to resolve a dispute, but is determining what the terms of a new agreement should be. Thus, notwithstanding section 1164's use of the word "mediator,"[4] the process amounts to compulsory interest arbitration.

■ There can be no doubt that the compulsory interest arbitration scheme provides for quasi-legislative action. Although the statutes refer to the end result as a "collective bargaining agreement," there is no agreement. In this case Hess not only did not agree to be bound by the terms of employment imposed by the mediator, it did not agree to submit to interest arbitration at all. The terms of the "agreement" determined by the arbitrator were imposed upon Hess by force of law.

---

[4] Generally, a mediator is a neutral third party who assists the principals in reaching a mutually acceptable resolution. (E.g., Evid. Code, § 1115.)

The statutory scheme is not quasi-judicial. An administrative action is quasi-judicial, or quasi-adjudicative, when it consists of applying existing rules to existing facts. (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 275 [32 Cal.Rptr.2d 807, 878 P.2d 566].) The creation of new rules for future application, such as is done here, is quasi-legislative in character. (*Ibid.*) This is so even though the action is, as here, taken in an individual case. (*Id.* at p. 277.)

This distinction has considerable significance because a variety of matters, such as the nature of the decision maker, the right to and nature of a hearing, the standards applied, and the scope of judicial review, vary between quasi-judicial and quasi-legislative acts. Our review here must be firmly rooted in the quasi-legislative nature of the statutory scheme. (See *Dawson v. Town of Los Altos Hills* (1976) 16 Cal.3d 676, 685 [129 Cal.Rptr. 97, 547 P.2d 1377], superseded by const. amend. on other grounds as stated in *Not About Water Com. v. Board of Supervisors* (2002) 95 Cal.App.4th 982, 994 [116 Cal.Rptr.2d 526].) With the quasi-legislative nature of the legislation in mind, we can consider Hess's specific contentions.

### III. *Substantive Due Process*

■ Hess contends the statutory scheme (§ 1164 et seq.) violates principles of due process in that it unreasonably interferes with the right of contract, denies the right of judicial review, and is aimed at protectionism. We disagree.

### A. *The Right of Contract*

In its substantive due process challenge to the statutory scheme, Hess relies upon a few older United States Supreme Court cases. The first, *Wolff Co. v. Industrial Court* (1923) 262 U.S. 522 [67 L.Ed. 1103, 43 S.Ct. 630] (*Wolff*), involved a Kansas act. The act declared that certain industries were affected with a public interest. It established a court of industrial relations with the authority to hear disputes over wages and other terms of employment and to fix wages and other terms of employment for the future conduct of the industry.[5] The Supreme Court held the act invalid. It said that, with respect to contracts, freedom is the general rule and restraint the exception, and that legislative abridgement of the freedom of contract can be justified only by exceptional circumstances. (*Wolff*, at p. 534 [67 L.Ed. at p. 1108].)

---

[5] The act not only allowed the court of industrial relations to set wages and other terms of employment, it prohibited businesses from ceasing operations and, although individual employees could quit, it forbade employees from engaging in joint attempts to secure different wages or terms. "In effect, strikes and lockouts, the boycott and picketing, are made unlawful." (*Dorchy v. Kansas* (1924) 264 U.S. 286, 288 [68 L.Ed. 686, 688, 44 S.Ct. 323].)

The other decisions upon which Hess relies were simply followup applications of the *Wolff, supra,* 262 U.S. 522, decision. In *Dorchy v. Kansas, supra,* 264 U.S. 286 [68 L.Ed. 686], the court reversed a criminal conviction of a union official who ordered a strike in violation of the Kansas act. In *Wolff Packing Co. v. Indus. Court* (1925) 267 U.S. 552 [69 L.Ed. 785, 45 S.Ct. 441, 21 Ohio L.Rep. 168] (*Wolff II*), the court reversed a writ of mandate requiring the employer to adhere to wage and term provisions issued by the court of industrial relations.

■ The trouble with these decisions as precedent is that they were rendered during the bygone era of substantive due process. At that time "the Due Process Clause was used by [the Supreme] Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy." (*Ferguson v. Skrupa* (1963) 372 U.S. 726, 729 [10 L.Ed.2d 93, 96, 83 S.Ct. 1028].) But that doctrine "has long since been discarded." (*Id.* at p. 730 [10 L.Ed.2d at p. 97].) "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." (*Williamson v. Lee Optical Co.* (1955) 348 U.S. 483, 488 [99 L.Ed. 563, 572, 75 S.Ct. 461].) As our state Supreme Court noted, the earlier substantive due process line of authority, including the *Wolff* decisions, has been "completely repudiated." (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 155 [130 Cal.Rptr. 465, 550 P.2d 1001].)

These days, courts defer to the Legislature and "when the [L]egislature has spoken, the public interest has been declared in terms well-nigh conclusive." (*Berman v. Parker* (1954) 348 U.S. 26, 32 [99 L.Ed. 27, 37, 75 S.Ct. 98]; see also *20th Century Ins. Co. v. Garamendi, supra,* 8 Cal.4th at p. 278.) Courts will not strike down a law on substantive due process grounds unless it "is manifestly unreasonable, arbitrary or capricious, and has no real or substantial relation to public health, safety, morals or general welfare." (*Massingill v. Department of Food & Agriculture* (2002) 102 Cal.App.4th 498, 504 [125 Cal.Rptr.2d 561].)

■ In *Nebbia v. New York* (1934) 291 U.S. 502 [78 L.Ed. 940, 54 S.Ct. 505], a law that allowed a control board to fix the minimum and maximum price of milk was challenged. The court made it clear that the right to contract is not absolute but is subordinate to the exercise of the police power by the state for the public welfare. (*Id.* at pp. 523–525 [78 L.Ed. at pp. 948–949].) "And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency." (*Id.* at p. 528 [78 L.Ed. at p. 952], fn. omitted.)

An employment relationship is fundamentally contractual. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 696 [254 Cal.Rptr. 211, 765 P.2d 373].) The contract may be terminable at will, and it may be upon terms dictated by the employer, but it is nonetheless contractual. In many, if not most, industries, individual employees lack sufficient bargaining power to negotiate terms of employment and must accept the employer's terms if they desire to be employed. Congress was concerned that employees do not have the "actual liberty of contract" and thus enacted the National Labor Relations Act (NLRA) to, among other things, equalize the bargaining power of employees with that of employers through the collective bargaining process. (29 U.S.C. § 151.) For similar reasons our Legislature enacted the ALRA to apply to agricultural workers. (§ 1140.2.)

Our Legislature has determined that the ALRA has not been fulfilling its purpose. "The Legislature finds and declares that a need exists for a mediation procedure in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the Agricultural Labor Relations Act, ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural labor force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1.)

In most collective bargaining situations the primary power an employee bargaining agent has is the power to strike. The power to take collective action through a strike serves to equalize the bargaining position of the parties. However, with respect to agricultural employment the Legislature could reasonably conclude that the power to strike is illusory. The unskilled character of the work, the relatively low wages paid, and the seasonal rather than year-round nature of the work combine to make collective action by employees untenable. The Legislature could reasonably conclude that despite the ALRA, agricultural workers lack "actual liberty of contract." (29 U.S.C. § 151.)

■ Hess contends that compulsory interest arbitration does not enhance the collective bargaining process because it eliminates mutual agreement and imposes a "contract" upon the parties. That argument reflects an unduly narrow consideration of the statutory scheme. The scheme is actually limited in scope. It applies only to the initial bargaining efforts of an employer and collective bargaining agent. An employer who has had a collective bargaining agreement with its employees, or who has had an "agreement" imposed upon it, is not subject to the process even if the agreement has expired and a new agreement has not been reached. The statutory remedy is a one-time thing. It would thus appear that the legislative purpose is to change attitudes toward

collective bargaining by compelling the parties to operate for at least one term with either a collective bargaining agreement or the functional equivalent of a collective bargaining agreement. The Legislature hopes that employers who have been resistant to collective bargaining will learn that collective bargaining can be mutually beneficial.

The wisdom of the legislative scheme certainly can be debated. However, in view of the Legislature's broad authority over employment, and the limited role of the courts in reviewing legislative policy decisions (see p. 1596, *ante*), this statutory scheme meets the constitutional test for substantive due process review.

B. *Judicial Review*

Hess contends that the statutory scheme strips it of the right to judicial review of the state-imposed agreement. It does not.

As previously noted, interest arbitration is quasi-legislative in character. The scope of judicial review to which an affected person is entitled must be firmly grounded in that consideration. (*Dawson v. Town of Los Altos Hills, supra*, 16 Cal.3d at p. 685.) The scope of judicial review of quasi-legislative decisions is well established. As we have noted, a reviewing court will consider whether the agency acted within the scope of its authority, whether it employed fair procedures, and whether its action is arbitrary, capricious, or wholly lacking in evidentiary support. (*Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 509 [208 Cal.Rptr. 850, 691 P.2d 606]; *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579].)

The statutory scheme requires that the mediator set forth the basis for his determinations and that the record support those determinations. (§ 1164, subd. (d).) The Board is required to set aside any portion of the mediator's decision that is based upon clearly erroneous findings of fact or that is arbitrary and capricious in light of the findings. (§ 1164.3, subds. (a), (b).) A party has the right to judicial review of the Board's decision, which includes whether the Board acted without or in excess of jurisdiction and whether the Board's order was an abuse of discretion. (§ 1164.5, subd. (b).) Excess of jurisdiction and abuse of discretion necessarily include limited factual review, that is, whether the decision is wholly lacking in evidentiary support. That is all the judicial review to which a party challenging a quasi-legislative determination is entitled. Thus, the statutory scheme gives Hess the scope of judicial review that is constitutionally required.

Hess's reliance on *Bayscene Resident Negotiators v. Bayscene Mobilehome Park* (1993) 15 Cal.App.4th 119 [18 Cal.Rptr.2d 626] (*Bayscene*), is misplaced. That case involved a city's ordinance providing for compulsory

arbitration of disputes over proposed rent increases. The ordinance did not provide for review of the arbitrator's decision by anyone, either the city council or the courts. The Court of Appeal assumed that general Code of Civil Procedure provisions applicable to private, voluntary arbitration would apply. Those provisions generally limit review of an arbitration award to issues of fraud, corruption, or other misconduct. (*Id.* at p. 134.) Unless the parties have agreed otherwise, a private, voluntary arbitration decision will not be reviewed for errors of fact or law, and will not be reversed even for error on the face of the award that causes substantial injustice. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11, 28 [10 Cal.Rptr.2d 183, 832 P.2d 899].)

It ought to be clear, as the *Bayscene* court concluded (*Bayscene, supra,* 15 Cal.App.4th 119), that a legislative body cannot compel a private party to submit to final, binding arbitration without any right of judicial review for errors of fact or law. But the Legislature did not do so with respect to agricultural employers. The statutory scheme at issue preserves the right to judicial review with adequate factual review for quasi-legislative purposes. The *Bayscene* decision is inapposite.

## C. *Protectionism*

Hess argues that the statutory scheme amounts to economic protectionism. However, the principle of economic protectionism—which holds that the commerce clause prohibits regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors—is not at issue in this case. (*Bronco Wine Co. v. Jolly* (2005) 129 Cal.App.4th 988, 1027 [29 Cal.Rptr.3d 462]; *Ceridian Corp. v. Franchise Tax Bd.* (2000) 85 Cal.App.4th 875, 882 [102 Cal.Rptr.2d 611].) Hess presents no issue concerning burdens on out-of-state businesses. Rather, Hess complains the contract terms imposed on it were established by comparison with other union contracts in other California locations (Watsonville, Sonoma, Fresno, Oxnard, and Santa Cruz County), assertedly without regard to individual business goals and obligations. Hess fails to show that the economic protectionism doctrine is relevant to this case.

Moreover, the main case relied upon by Hess, *State Board v. Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436 [254 P.2d 29], is inapposite. It did not use the term economic protectionism but involved a law that authorized a State Board of Dry Cleaners (composed mostly of people who owned dry cleaning establishments) to set minimum prices for dry cleaning establishments in cities or counties, for the ostensible purpose of protecting public health and safety. (*Id.* at p. 439.) The Supreme Court held the statute invalid, concluding (1) there was no connection between the asserted purpose of the law and the law's provisions, which served only to prevent price competition, and (2) the

statute improperly delegated legislative authority to a board that consisted mainly of persons who had a pecuniary stake in restricting competitors' rights. (*Id.* at pp. 441–443, 448.) In the case now before us, as we discuss *post*, a connection does exist between the law's provisions and its purpose, and there is no improper delegation of legislative authority. Hess does not contend or demonstrate that the mediator or anyone on the Board had a pecuniary stake in restricting competition.

Hess's protectionism argument is really an argument against the wisdom of the statutory scheme. In this respect it suffices to note:

(1) The Legislature regards agriculture to be the state's most vital industry. (Stats. 2002, ch. 1145, § 1.) It can certainly act to protect that industry by promoting stability in agricultural employment. (See *Agricultural Prorate Com. v. Superior Ct.* (1936) 5 Cal.2d 550, 582–583 [55 P.2d 495].)

(2) The Legislature could reasonably conclude that agricultural employees are in an especially unequal bargaining position with respect to their employers and that their health, safety and welfare require special protection. (See *West Coast Hotel Co. v. Parrish* (1937) 300 U.S. 379, 393–397 [81 L.Ed. 703, 710–711, 57 S.Ct. 578].) That the Legislature acted to protect the stability of the industry and/or the health, safety and welfare of employees does nothing to condemn the legislation.

We conclude Hess's due process arguments fail.

## IV. *Equal Protection*

Hess argues the statutory scheme violates equal protection because it applies only to agricultural employers while employers in other industries are not subjected to compulsory interest arbitration. This argument is not well-founded.

The parties agree that the test to be applied is whether the classification effected by the statutory scheme bears a rational conceivable relationship to a legitimate state purpose. (See *Warden v. State Bar* (1999) 21 Cal.4th 628, 641 [88 Cal.Rptr.2d 283, 982 P.2d 154]; *Hale v. Morgan* (1978) 22 Cal.3d 388, 395 [149 Cal.Rptr. 375, 584 P.2d 512].)

As we have recounted, proponents of the legislation enacting section 1164 demonstrated that agricultural employers were refusing to agree to the terms of collective bargaining agreements. Also, we have noted the Legislature declared "a need exists for a mediation procedure in order to ensure a more

effective collective bargaining process between agricultural employers and agricultural employees . . . ." (Stats. 2002, ch. 1145, § 1.)

It appears that there were peculiar problems with the collective bargaining process between agricultural employers and agricultural employees. These peculiar problems provide a rational basis for the enactment of interest arbitration legislation applicable to agricultural employers and employees but not to employees of other businesses or industries.

■ Our dissenting colleague views section 1164 as resulting in disparate treatment within the class of employers lacking an initial collective bargaining agreement, because the agreement imposed on each employer in this class will be different. However, among the factors to be considered by the mediator under the applicable regulation and the current statute are the "corresponding wages, benefits, and terms and conditions of employment in other collective bargaining agreements covering similar agricultural operations with similar labor requirements," and "corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed." (§ 1164, subd. (e); see also regulation 20407; fn. 1, *ante*.)

These requirements reasonably ensure that contracts of different employers will be similar. There is no equal protection violation.

## V. *Delegation of Legislative Authority*

Hess argues the statutory scheme invalidly delegates legislative authority. We disagree.

■ "An unconstitutional delegation of legislative power occurs when the Legislature confers upon an administrative agency unrestricted authority to make fundamental policy decisions. [Citations.] 'This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions.' [¶] The doctrine prohibiting delegations of legislative power does not invalidate reasonable grants of power to an administrative agency, when suitable safeguards are established to guide the power's use and to protect against misuse. [Citations.] The Legislature must make the fundamental policy determinations, but after declaring the legislative goals and establishing a yardstick guiding the administrator, it may authorize the administrator to adopt rules and regulations to promote the purposes of the legislation and to carry it into effect. [Citations.]

Moreover, standards for administrative application of a statute need not be expressly set forth; they may be implied by the statutory purpose. [Citations.]" (*People v. Wright* (1982) 30 Cal.3d 705, 712–713 [180 Cal.Rptr. 196, 639 P.2d 267] (*Wright*).)

"Doctrinaire legal concepts should not be invoked to impede the reasonable exercise of legislative power properly designed to frustrate abuse. Only in the event of a total abdication of that power, through failure either to render basic policy decisions or to assure that they are implemented as made, will this court intrude on legislative enactment because it is an 'unlawful delegation,' and then only to preserve the representative character of the process of reaching legislative decision." (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 384 [71 Cal.Rptr. 687, 445 P.2d 303].)

Here, the "fundamental policy decisions" (*Wright, supra,* 30 Cal.3d at p. 712) are contained in the Legislature's express declaration that "a need exists for a mediation procedure in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the [ALRA], ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural work force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1.)

The details of this mediation procedure were delegated to the Board by the Legislature's enactment of section 1144, authorizing the Board to adopt regulations: "The board may from time to time make, amend, and rescind, in the manner prescribed in Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, such rules and regulations as may be necessary to carry out this part." (§ 1144.) Pursuant to the authority in section 1144, the Board adopted regulation 20407, which is set out in footnote 1, *ante*.

Here, the mediator stated he considered the criteria, and he specifically described the comparison to contracts of other employers (submitted by the Union), his assumption these other contracts were accurate representations (since Hess did not contradict them), and his (the mediator's) conclusion that this collective bargaining agreement does not deviate significantly from area practice and area contract standards. He did not expressly discuss the overall cost of living, but he had considered the Consumer Price Index, which was submitted by the Union.

Regulation 20407 did not make "fundamental policy decisions" (*Wright, supra,* 30 Cal.3d at p. 712) but rather outlined the specific factors the mediator and the Board would apply in arriving at a collective bargaining agreement. We perceive no unlawful delegation of legislative power in the Legislature's delegation to the Board of the Board's authority, based on its expertise in the agricultural economic sector, to adopt regulation 20407. (*Wright, supra,* 30 Cal.3d at p. 713; *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 201 [172 Cal.Rptr. 487, 624 P.2d 1215]; *Alexander v. State Personnel Bd.* (2000) 80 Cal.App.4th 526, 538 [95 Cal.Rptr.2d 324]; *People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 496 [96 Cal.Rptr. 553, 487 P.2d 1193].)

However, even assuming without deciding that the Board's adoption of its regulation did not cure the problem of an unlawful delegation of legislative power, we see no cause to reverse the judgment. This is because our state Constitution commands that we reverse a judgment only if we conclude there has been a "miscarriage of justice." (Cal. Const., art. VI, § 13.)

We perceive no miscarriage of justice here, because, shortly after the Board acted in this case, the Legislature enacted new subdivision (e) to section 1164 with language that is nearly identical to the language of regulation 20407, relied on and applied by the mediator in this case. (Stats. 2003, ch. 870, § 1; cf. fns. 1 & 2, *ante.*)

Since the Legislature has ratified the criteria applied by the mediator, pursuant to regulation 20407, any earlier unlawful delegation to the Board has resulted in no miscarriage of justice and no cause to reverse the judgment. (Cal. Const., art. VI, § 13.)

Hess argues that, notwithstanding adoption of the aforementioned criteria governing the mediator's making of a collective bargaining agreement, there is still an unconstitutional delegation of legislative power. In the words of Hess, "Both the ALRB regulations and newly enacted section 1164(e) simply state that the arbitrator [*sic*] 'may' consider criteria applied in 'similar proceedings,' such as a comparison of similarly situated employees, but even these vague factors can be disregarded by the arbitrator [*sic*]." (See fns. 1 & 2, *ante.*)

Hess assumes the word "may" vests discretion with the mediator to disregard the criteria spelled out in regulation 20407 and in section 1164, subdivision (e). In other words, Hess argues that the mediator was really free to make up an agreement out of whole cloth, without any standards at all. We do not agree with Hess's view of things. The word "may" may be either mandatory or permissive, depending on all the circumstances. (*So. Cal. Jockey*

*Club v. Cal. etc. Racing Bd.* (1950) 36 Cal.2d 167, 173 [223 P.2d 1].) " 'Where persons or the public have an interest in having an act done by a public body *"may"* in a statute means *"must."* [Citation.] Words permissive in form, when a public duty is involved, are considered as mandatory.' [Citation.]" (*Harless v. Carter* (1954) 42 Cal.2d 352, 356 [267 P.2d 4].)

 Here, the ultimate responsibility for applying the aforementioned criteria lies in the Board, a public entity. In addition, it is hornbook law that, "where 'the "terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution." ' [Citations.]" (*People v. Davenport* (1985) 41 Cal.3d 247, 264 [221 Cal.Rptr. 794, 710 P.2d 861].)

Because a permissive use of the word "may" in regulation 20407 and in section 1164, subdivision (e), could render illusory the criteria in the regulation and the statute, we conclude that, in this context, as in the cases discussed above, "may" means "must." A mediator crafting a collective bargaining agreement *must* apply the criteria set out in regulation 20407 and in section 1164, subdivision (e).

This conclusion is not at odds with section 15, which provides that in the Labor Code, " 'Shall' is mandatory and 'may' is permissive." Section 15 must be read together with section 5, which provides, *"Unless the context otherwise requires,* the general provisions hereinafter set forth shall govern the construction of this code." (Italics added; see 18 Ops.Cal.Atty.Gen. 216, 217 (1951).) Because we will not assume the Legislature wished to engage in an unconstitutional grant of legislative power, the present context requires that we construe "may" as "must" in regulation 20407 and in section 1164, subdivision (e). (18 Ops.Cal.Atty.Gen., *supra*, at p. 217.)

So construed, section 1164 does not reflect an unconstitutional delegation of legislative power to the mediator or the Board.

We find the criteria set out in regulation 20407 and in subdivision (e) of section 1164 are sufficiently concrete to provide lawful guidance to the mediator and the Board.[6] There is no unlawful delegation of legislative power.

---

[6] Hess also appears to argue in passing that the Legislature cannot delegate arbitration authority to a *private* mediator. However, this argument is waived for failure to cite any authority in support of the argument. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].)

That the mediator is a private person rather than a publicly accountable official or elected entity does not render the delegation unconstitutional. At our invitation, the parties and amici curiae submitted supplemental briefs on the issue of whether delegation to a private actor under section 1164 constitutes an unconstitutional delegation of legislative power. Because we find sufficient guidance in California authority, we need not address cases from other jurisdictions.

The various briefs argue the mediator's role is legislative, quasi-legislative, or not legislative at all. We accept for purposes of this case the position that the Legislature's designation of the mediator as the person who resolves disagreements between the parties concerning the provisions of the collective bargaining agreement is a delegation of legislative authority.

 The act of delegating legislative authority to a private mediator does not render the mediator a public official. (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 294 [132 Cal.Rptr.2d 713, 66 P.3d 718] [the act of delegation does not change a private body into a public body].) *Riverside* held invalid a statute requiring counties and local agencies to submit to binding arbitration of economic issues that arose during negotiations with unions representing firefighters or law enforcement officers. However, *Riverside* is not on point with this case. The Supreme Court there held the statute violated California Constitution article XI, section 11, subdivision (a), which states, "The Legislature may not delegate to a private person or body power to make, control, appropriate, supervise, or interfere with county or municipal corporation improvements, money, or property, or to levy taxes or assessments, or perform municipal functions." (See 30 Cal.4th at pp. 291–295.) No such constitutional prohibition applies to this case.

The Legislature's delegation of authority to a private party is not necessarily unconstitutional. "Once the Legislature has established the law, it may properly delegate the authority to administer or apply the law to *private* or governmental entities." (*People ex. rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 632 [92 Cal.Rptr.2d 115] (*Sun Pacific*), italics added, citing *Wilkinson v. Madera Community Hospital* (1983) 144 Cal.App.3d 436, 442 [192 Cal.Rptr. 593] (*Wilkinson*).) "A proper delegation [of authority to administer or apply the law] may be made to *private* or governmental entities." (*Wilkinson, supra*, 144 Cal.App.3d at p. 442, italics added, citing *Kugler v. Yocum, supra*, 69 Cal.2d at pp. 376–377.)

In *Sun Pacific, supra*, 77 Cal.App.4th 619, a citrus grower was ordered by the court to remove infected citrus trees in a nuisance action brought by a county pest control district formed for the eradication of a virus infecting citrus trees. The defendant argued the pest control law unconstitutionally

delegated legislative authority to a limited number of private, self-interested citrus growers (who comprised the district's board of directors), by allowing the district unbridled power to "set policy" by determining matters such as budgets, assessment rates, applicability of forcible tree removal, degree of testing for infection, and whether to bring judicial action. (*Id.* at pp. 632–633.) *Sun Pacific* rejected the argument and upheld the pest control law. The legislation set forth the purpose (to make available a procedure for the organization, operation, government and dissolution of districts for more effective control and eradication of citrus pests), called for formulation of plans based on best known and accepted methods for eradication, and authorized removal of infected trees. (*Id.* at pp. 633–634.) "Thus, the Legislature, pursuant to its legislative policymaking power, resolved the fundamental issue that the best interests of society would be served by the control and eradication of citrus pests . . . ." (*Id.* at p. 634.) The Legislature also provided sufficient safeguards, e.g., requiring the district to formulate plans based on the best known and accepted methods for pest control, to hold public hearings and pass on all protests before adopting a budget. (*Id.* at p. 635.)

*Wilkinson, supra,* 144 Cal.App.3d 436, held that a statute permitting hospitals to require staff doctors to carry malpractice insurance was not an unconstitutional delegation of power. The statute could be read as containing an implied safeguard limiting hospitals to reasonable insurance requirements to protect the hospitals' financial integrity. (*Id.* at pp. 442–443 [in a proper case, the requisite safeguards may be implied by the statutory purpose].)

Here, as we have seen, the fundamental policy decisions (*Wright, supra,* 30 Cal.3d at p. 705) are contained in the Legislature's express declaration that "a need exists for a mediation procedure in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the [ALRA], ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural work force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1.) As we have also explained, adequate standards were and are in place. Additionally, as we have explained, the mediator's report is subject to review by the Board on grounds that a provision of the agreement is (1) unrelated to wages, hours, or other conditions of employment, (2) based upon clearly erroneous findings of material fact, or (3) arbitrary or capricious in light of the mediator's factual findings. (§ 1164.3, subd. (a).) The parties also have the right to seek Board review of the mediator's report on the grounds that (1) the report was procured by corruption, fraud, or other undue means, (2) there was corruption in the mediator, or (3) the rights of the petitioning party were substantially

prejudiced by misconduct of the mediator. (§ 1164.3, subd. (e).) Either party may then petition an appellate court for limited review of the Board's action. (§ 1164.5.)

Our dissenting colleague quotes from a dissenting opinion of Justice Brown in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553 [71 Cal.Rptr.2d 731, 950 P.2d 1086], that "the Legislature may not invest a private body with the power to draft rules having the effect of law; to do so would unconstitutionally transfer powers confided to one arm of government to private parties. (*Bayside Timber Co.* [*v. Board of Supervisors* (1971) 20 Cal.App.3d 1,] 11–12 [97 Cal.Rptr. 431].)" (*Stop Youth Addiction, supra,* 17 Cal.4th at p. 590 [majority upheld (former) unfair competition law, which conferred standing on unharmed private individuals to sue in the public's interest].) However, aside from the nonbinding nature of dissenting opinions, the quoted language overstated *Bayside Timber, supra,* 20 Cal.App.3d at pages 11–12, which said a grant of legislative authority must be accompanied by safeguards to prevent its abuse, and "[w]hen legislative authority without standards for its guidance is delegated to an agency or group of individuals with a pecuniary interest in its subject matter, the constitutional fault is compounded." (*Id.* at p. 12.) In *Bayside Timber,* the Legislature delegated to timber owners and operators the exclusive power to formulate forest practice rules with the force and effect of law. (*Id.* at p. 10.) The defect, in the appellate court's view, was the absence of guides or standards to prevent abuse by those with a pecuniary interest in the subject matter. (*Id.* at pp. 10–12.) Here, in contrast, the delegation is to a neutral mediator, not to agricultural employers or employees, and the mediator's action is subject to review by the Board. Even assuming for the sake of argument that a mediator is more likely to expect repeat business from a union than from an individual employer (as Hess argues), Hess concedes it has no reason to believe that its agreed-upon mediator, Gerald McKay, had an interest in the outcome of this case.

We conclude there is no unlawful delegation of legislative power.

VI. *Vague and Overbroad*

Hess argues the statutory scheme is vague and overbroad. We disagree.

This argument is simply a reiteration of the unlawful delegation argument. Hess asserts that the statutory scheme contains too few standards to guard against arbitrary and capricious action. As we rejected the delegation argument, we also reject this argument.

## DISPOSITION

The Agricultural Labor Relations Board's order is affirmed. The stay of the Agricultural Labor Relations Board's order is dissolved as of the date that this decision becomes final. The United Food and Commercial Workers Union shall recover its costs on appeal. (Cal. Rules of Court, rule 56(*l*).)

Scotland, P. J., concurred.

**NICHOLSON, J.,** Dissenting.—I respectfully dissent. In my view, Labor Code section 1164, as of the time relevant to this case, delegated legislative power unconstitutionally and violated equal protection guarantees of the state and federal Constitutions.

### *Invalid Delegation of Legislative Power*

The Legislature delegated its power to a private person without setting fundamental public policy standards to guide that person's legislative acts. Nothing in Labor Code section 1164 controlled the discretion of the "mediator" in deciding the terms of the "collective bargaining agreement" or how the Agricultural Labor Relations Board (Board) and the court were to measure the award on review.

"An unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy. [Citation.]" (*Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 190 [197 Cal.Rptr. 284, 672 P.2d 1297].) "An unconstitutional delegation of power occurs when the Legislature confers upon an administrative agency the unrestricted authority to make fundamental policy determinations. [Citations.] To avoid such delegation, the Legislature must provide an adequate yardstick for the guidance of the administrative body empowered to execute the law. [Citations.] Underlying these rules is the belief that the Legislature as the most representative organ of government should settle insofar as possible controverted issues of policy and that it must determine crucial issues whenever it has the time, information and competence to deal with them. [Citation.]" (*Clean Air Constituency v. State Air Resources Bd.* (1974) 11 Cal.3d 801, 816–817 [114 Cal.Rptr. 577, 523 P.2d 617].)

Labor Code section 1164 and the subsequent sections provided no consequential checks on the power of the private mediator. When regarded closely, the statutes provided no fundamental public policy guidance.

The requirement that the mediator's report must be "supported by the record" (Lab. Code, § 1164, subd. (d)) is virtually meaningless in the context of drafting a collective bargaining agreement. When a person makes an adjudicative decision, that person makes factual findings and applies the law to those findings. When making a legislative decision, on the other hand, the person has no law to apply to factual findings because the decision itself is a legislative act. Even though under the statute at issue the mediator must make factual findings and those findings must be supported by the record, there is no way to determine whether the facts found by the mediator support the decision unless one knows what basic public policy the mediator must vindicate.

For example, suppose that the mediator can show that every provision included in the collective bargaining agreement the mediator drafts is found in one of the potentially numerous collective bargaining agreements between other parties that are presented as evidence at the mediation. A party could argue that the collective bargaining agreement is "supported by the record." Yet, it could still be a collective bargaining agreement that either bankrupts the employer or imposes great hardship on the employees. There is no public policy to guide or limit the mediator and no standard for the Board or the courts to review the mediator's report.

The statutory review procedures provided no remedy for this lack of standards and basic public policy guidance. The Board could set aside the mediator's report if a provision was unrelated to wages, hours, or other conditions of employment or the report was based on clearly erroneous findings of fact. (Lab. Code, § 1164.3, subd. (a).) These limitations provided no clue concerning what the terms of a collective bargaining agreement should be.

In rejecting a challenge to the legislative delegation in a rent control case, the Supreme Court concluded: "By stating its purpose and providing a nonexclusive illustrative list of relevant factors to be considered, the charter amendment provides constitutionally sufficient legislative guidance to the Board for its determination of petitions for adjustments of maximum rents." (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 168 [130 Cal.Rptr. 465, 550 P.2d 1001].) The Legislature failed to provide similar guidance to the mediator under Labor Code section 1164. The sole purpose stated was to "ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the Agricultural Labor Relations Act, ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural work force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1.) This pronouncement was so general it failed to provide actual guidance.

The majority sidesteps the issue of improper delegation by noting that (1) the Board came up with its own standards, and (2) the Legislature was just about to set some standards. Neither rationale justifies the wholesale delegation of legislative power. First, it is illogical to say that a delegation was not standardless because the delegate set standards. The Board is not the legislative body relevant to the delegation question. If it were sufficient, under delegation analysis, for the Legislature to delegate its power to agencies with the understanding that the agencies would create standards for exercising the legislative power, we would scarcely need a Legislature. And second, I am unaware of authority allowing us to correct an unconstitutional prior legislative enactment by applying an amendment retroactively. Neither can I agree that no miscarriage of justice occurs when parties are forced into a "contractual" relationship based on an unconstitutional exercise of legislative power by a private person. While I do not necessarily agree that the amendment to Labor Code section 1164 cured the delegation problem, that issue is not presented to us.

Exacerbating this delegation problem is that the delegation was to a private person, not a publicly accountable official or elected entity. At times, courts have upheld delegation of legislative powers to a private person or body by noting the statute at issue gave the private person or body a portion of the sovereign's legislative power. (See, e.g., *City of Warwick v. Warwick Regular Firemen's Ass'n* (1969) 106 R.I. 109 [256 A.2d 206, 210–211].) This reasoning is flawed, attempting to justify the delegation of sovereign power to a private person by deeming the private person a public officer because of the delegation to the private person of sovereign power. Indeed, the California Supreme Court rejected this circular justification in its opinion finding that the home rule provisions of the California Constitution prohibit the Legislature from delegating to a private entity the right to establish compensation for county employees. The court concluded: "The act of delegation does not change a private body into a public body and thereby validate the very delegation the section prohibits." (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 294 [132 Cal.Rptr.2d 713, 66 P.3d 718].)

Here, there was no pretense concerning the private or public nature of the person drafting the collective bargaining agreement. The statute required only that it be a "mediator[] who [has] experience in labor mediation." (Lab. Code, § 1164, subd. (b).)

In her dissenting opinion in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553 [71 Cal.Rptr.2d 731, 950 P.2d 1086], Justice Brown discussed the important principles protected here: "[T]he Legislature may not invest a private body with the power to draft rules having the effect of law; to do so would unconstitutionally transfer powers confided to one arm of

government to private parties. (*Bayside Timber Co.* [*v. Board of Supervisors* (1971) 20 Cal.App.3d 1,] 11–12 [97 Cal.Rptr. 431].) By requiring that the transfer of essential powers—whether from one arm to another or to a private group or person—be accompanied by the retention of controls sufficient for the delegating arm to retain ultimate power over their exercise, the delegation doctrine preserves the integrity of divided government. In the absence of such controls, the powers of one arm of government are weakened while those of another are expanded." (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra,* 17 Cal.4th at pp. 590–591 (dis. opn. of Brown, J.).)

In summary, this legislative scheme delegated legislative power to a lone private mediator to draft a collective bargaining agreement, virtually by fiat, to govern the relationship of the private employer and employee. The scheme was invalid because it gave the mediator power to create basic public policy, provided no standards for resolving the disputed issues between the parties, and lacked meaningful review of the mediator's report. Labor Code section 1164 invalidly delegated legislative authority. I would therefore set aside the Board's order enforcing the collective bargaining agreement to preserve the proper representative character of the legislative process. (See *Kugler v. Yocum* (1968) 69 Cal.2d 371, 383–384 [71 Cal.Rptr. 687, 445 P.2d 303].)

*Equal Protection*

Even if I were to conclude that Labor Code section 1164 and related statutes did not effect an unconstitutional delegation of legislative power, I would nonetheless find that the resulting exercise of legislative power by the private mediator violates the equal protection guarantees of the state and federal Constitutions.

"An administrative order, legislative in character, is subject to the same tests as to validity as an act of the Legislature. [Citations.]" (*Knudsen Creamery Co. v. Brock* (1951) 37 Cal.2d 485, 494 [234 P.2d 26].) Applying this canon here, the private mediator's legislative act—the initial collective bargaining agreement between Hess and its employees—is subject to the same test of constitutionality under the equal protection clause as any act of the Legislature.

"The constitutional bedrock upon which all equal protection analysis rests is composed of the insistence upon a rational relationship between selected legislative ends and the means chosen to further or achieve them. This precept, and the reasons for its existence, have never found clearer expression

than the words of Justice Robert Jackson, uttered 30 [now many more] years ago. 'I regard it as a salutary doctrine,' Justice Jackson stated, 'that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants *except upon some reasonable differentiation fairly related to the object of regulation.* This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.' (*Railway Express v. New York* (1949) 336 U.S. 106, 112–113 [93 L.Ed. 533, 540, 69 S.Ct. 463] (Jackson, J., conc.), italics added.)" (*Hays v. Wood* (1979) 25 Cal.3d 772, 786–787 [160 Cal.Rptr. 102, 603 P.2d 19].)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike. [Citation.] . . . The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. [Citations.] When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, [citations], and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439–440 [87 L.Ed.2d 313, 320, 105 S.Ct. 3249].)

The state Constitution provides that "[a] person may not be . . . denied equal protection of the laws" (Cal. Const., art. I, § 7, subd. (a)) and "[a] local or special statute is invalid in any case if a general statute can be made applicable." (Cal. Const., art. IV, § 16, subd. (b).) "[T]he test for determining the validity of a statute where a claim is made that it unlawfully discriminates against any class is substantially the same under the state prohibitions against special legislation and the equal protection clause of the federal Constitution." (*County of L.A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 389 [196 P.2d 773].)

I assume, for the sake of argument, that treatment of an agricultural employer that does not reach agreement with the union on an initial collective bargaining agreement can be different from the treatment of an agricultural employer that reaches an agreement with the union on an initial collective

bargaining agreement because of the state's interest in promoting collective bargaining agreements. Here, however, the disparate treatment is not just between employers with initial collective bargaining agreements and employers without such agreements. Application of Labor Code section 1164 and the related statutes results in disparate treatment *within* the class of employers without an initial collective bargaining agreement because the agreement imposed on each employer in this class will be different. While the legitimate state interest that I assume for argument exists may justify disparate treatment between classes, it cannot justify disparate treatment within the class. (*Cleburne v. Cleburne Living Center, supra,* 473 U.S. at p. 439.)

Labor Code section 1164 sets forth the classification at issue in this case: agricultural employers who, for whatever reason, do not agree to the terms of an initial collective bargaining agreement. Within this class, the law does not treat the individual employers similarly. Instead, each employer will be subjected to a different legislative act, in the form of a collective bargaining agreement. Thus, similarly situated employers are treated dissimilarly.

Beyond the classification set by Labor Code section 1164, there is no rational way to break the agricultural employers down into smaller groups. The statute makes no such attempt, except, of course, to break it down so that every agricultural employer is the one and only member of the class. This means of classification, however, is the very antithesis of equal protection. While the Legislature may have intended this as a way to avoid the political retribution it might incur if it enacted laws applicable equally across the class, that motivation is entirely insufficient to justify the disparate treatment. (See *Hays v. Wood, supra,* 25 Cal.3d at pp. 786–787.)

" ' "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." ' [Citations.]" (*Village of Willowbrook v. Olech* (2000) 528 U.S. 562, 564 [145 L.Ed.2d 1060, 1063, 120 S.Ct. 1073].) Here, the discrimination—that is, holding Hess, and no other agricultural employer, to the terms of a private legislator's decision—is intentional because the mediator has no power to extend the enactment to other agricultural employers. The mediator could have had no intent other than to impose a collective bargaining agreement enforceable only as to Hess and no other agricultural employer. Furthermore, the discrimination is arbitrary because there are no standards set forth pursuant to which the mediator's decision in this case will be the same as a

mediator's decision in any other case under Labor Code section 1164 and the related statutes. Enforcement of the mediator's decision violates equal protection principles and, therefore, should be set aside.

A petition for a rehearing was denied July 20, 2006, and petitioner's petition for review by the Supreme Court was denied September 13, 2006, S145732. Baxter, J., was of the opinion that the petition should be granted.